BARRY J. PORTMAN
Federal Public Defender
JODI LINKER
Assistant Federal Public Defender
19th Floor Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant SIMON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-07-0335 SI |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S SENTENCING MEMORANDUM** |
| | ) | |
| v. | ) | |
| | ) | Hearing Date: January 24, 2008 |
| MARTIN SIMON, | ) | Time: 3:30pm |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................. 1

BACKGROUND .................................................................... 2

    I.    Despite the Tireless Support of His Mother, Mr. Simon's Life Has Been Defined By the Absence of His Father ........................................ 2

    II.    Mr. Simon Has Significant Cognitive and Physical Impairments After Having Been the Victim of Five Gunshot Wounds .............................. 2

    III.    Mr. Simon's State Conviction for the Same Offense Conduct ............... 4

DISCUSSION ..................................................................... 6

    I.    The Court Can Remedy the Inequity of This Successive Federal Prosecution By Sentencing Mr. Simon to Twenty-Four Months .......................... 6

        A.    Recent Supreme Court Authority Supports a Sentence of Twenty-Four Months ............................................................... 6

        B.    A Sentence of Twenty Four Months Will Adequately Account for All Federal Interests .................................................. 8

        C.    Mr. Simon Has Been Prejudiced By This Successive Prosecution  9

        D.    This Court Should Preserve the Spirit and Substance of the State Plea Disposition that Called for a Two Year Sentence for Mr. Simon's Conduct ................................................... 12

    II.    Mr. Simon's Criminal History Category is Significantly Overstated ......... 13

CONCLUSION ................................................................... 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brewster v. City of Napa*, 210 F.3d 1093 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 10

Gall v. United States, 128 S. Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

*Heath v. Alabama*, 474 U.S. 82 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kimbrough v. United States*, 128 S. Ct. 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Petite v. United States*, 361 U.S. 529 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rinaldi v. United States*, 434 U.S. 22 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

*United States v. Lovasco*, 431 U.S. 783 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Ross*, 123 F.3d 1181 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Snell*, 592 F.2d 1083 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL STATUTES

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

BARRY J. PORTMAN
Federal Public Defender
JODI LINKER
Assistant Federal Public Defender
19th Floor Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant SIMON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-07-0335 SI |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | Hearing Date: January 24, 2008 |
| MARTIN SIMON, | Time: 3:30pm |
| Defendant. | |

## INTRODUCTION

Defendant Marin Simon stands before this Court to be sentenced on his conviction for unlawfully possessing a firearm, in violation of 18 U.S.C. § 922(g)(1). Mr. Simon was convicted of and sentenced for the very same offense, based on the very same conduct, in San Mateo County Superior Court. Having already pled guilty to the exact same conduct in state court, Mr. Simon had no choice but to timely accept responsibility for possessing the firearm in this Court. However, he entered into a plea agreement with the government that recognizes the unique situation presented here and allows him to seek a sentence from this Court that corrects the injustice created by this duplicitous prosecution. Thus, Mr. Simon respectfully files this sentencing memorandum seeking a sentence of 24 months imprisonment – the same amount of

time he received from the state court – to be run concurrently with his state sentence.

## BACKGROUND

### I. Despite the Tireless Support of His Mother, Mr. Simon's Life Has Been Defined By the Absence of His Father

Mr. Simon's mother, Saundra Small, devoted her life to trying to create a positive life for her son. *See* Exhibit A, Letter from Saundra Small to the Court. Despite her best efforts, Mr. Simon was plagued by his desire to have the support and attention of his father. Mr. Simon adores his father, but his father has never given him any of the attention or support that he needed. Unfortunately, much of Mr. Simon's misbehavior can be traced to the troubled relationship he has had with his father. The only way he could get any attention from his father was by acting out. As his mother explains: "It became apparent that Martin would rather accept the attention he received from his father for his negative behavior than not to receive any attention from him at all." *Id*. at p. 2.

Mr. Simon has finally given up on trying to get the support and attention he desired from his father. Now, he has determined that while he cannot change the deficits in his life that were caused by the absence of his father, he can ensure that things are different for his two sons, Markhi, age 5, and Malaki, age 3. *See* Exhibit C, Letter from Candace Charles to the Court, January 16, 2008 & Exhibit D, Photos. Mr. Simon is totally devoted to his two children and wants to prove that he can be a better father to them than he had for himself. He is also committed to bettering himself, and when released from custody would like to "mentor[] other young men to try to help them see that street life leads to a dead end and even if a person survives there are both physical and emotional scars that remain a lifetime." Ex. A at p.4.

### II. Mr. Simon Has Significant Cognitive and Physical Impairments After Having Been the Victim of Five Gunshot Wounds

Mr. Simon has been the victim of five gunshot wounds sustained on two different occasions, December 14, 2005 and June 28, 2006, which have resulted in significant cognitive

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.               2

1   and physical impairments. While Mr. Simon acknowledges that he has made some poor choices
2   in his life, his misbehavior had little to do with the reason he was shot. Indeed, the same
3   individual is responsible for both shootings: the first shooting was over a woman, and the second
4   was an attempt to silence Mr. Simon so that he could not snitch about the first shooting.

5       At the time of the first shooting, on December 14, 2005 at approximately 11:00 a.m., Mr.
6   Simon was walking down the street talking on his cell phone when he was shot in the head and
7   the arm. The individual who shot him did so because he was jealous and angry that Mr. Simon
8   had dated a woman who the shooter was interested in. One bullet hit the temporal and occipital
9   bones of his skull and ricocheted out of his brain. The damage caused by the bullet has left Mr.
10  Simon with significant cognitive impairments, the loss of approximately one-half of his eyesight
11  in each eye with a permanent right visual field cut (such that he cannot see individuals
12  approaching in his right visual field), and a seizure disorder. *See* Exhibit B, Letter from Dr.
13  Lefkos Aftonomos, M.D. to the Court, November 16, 2007. As a result of Mr. Simon's gunshot
14  wounds, he has undergone nine surgeries. *See* Exhibit E, Photos. After the first surgery, he was
15  comatose for four days; the doctors had to remove a portion of his skull and put it "on ice" for a
16  period of weeks to allow the swelling in his brain to subside. He could not recognize his mother
17  or children, and could not remember his name or date of birth. Ex. A at p. 2 & Ex. C. He
18  experienced bouts of paranoia and disorientation. *Id*. He was in the hospital for thirty days and
19  then transferred to San Mateo Rehabilitation Center. *Id*.

20      Shortly after it became apparent that Mr. Simon would survive the first shooting, the
21  individual who shot Mr. Simon put out a "hit" on him in an attempt to prevent Mr. Simon from
22  revealing who had originally shot him. Thus, on June 28, 2006, just six month after the first
23  shooting, Mr. Simon was shot again while sitting outside his grandmother's home. He was shot
24  three times on this occasion: once in the right arm, and twice in the left leg. This shooting
25  resulted in permanent damage to Mr. Simon's peroneal nerve located at the top of his left calf.
26  This has also left Mr. Simon with a condition called Drop Foot, which causes difficulty walking

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.                3

and has left Mr. Simon with a limp. His grandmother and other family members witnessed the shooting and have been traumatized by fear that the shooter may return. In fact, his grandmother has been diagnosed with post traumatic stress disorder as a result of this incident. Ex. A at p.2. And his mother and fiancé fear for their lives and the lives of Mr. Simon's children. Ex. A at p. 2-3 & Ex. C.

As detailed by Mr. Simon's physician, Dr. Lefkos Aftonomos, M.D., and his mother, and as is readily apparent in speaking with Mr. Simon, these shootings have had a devastating impact on Mr. Simon's cognitive abilities. Dr. Aftonomos explains as follows:

> Most significantly, because of his brain injury, he has persisting cognitive impairments complicated by a lack of awareness of these deficits and essentially no ability to adjust his behavior in an attempt to compensate. He is behaviorally disinhibited and extremely concrete in ideation with difficulty in understanding complex language or simple abstract concepts. His impairments in judgment and problem solving leave him easily influenced by others and susceptible to exploitation–obviously an issue in a prison setting.

Exhibit B, Letter from Dr. Lefkos Aftonomos, M.D. to the Court, November 16, 2007.

Mr. Simon's verbal and reading comprehension, as well as his memory, have been significantly impaired by his brain injuries. For example, if asked to do four things, Mr. Simon will only remember two things, and will have absolutely no consciousness that he has forgotten the other two. With the tireless support of his mother, Mr. Simon has been able to relearn certain basic life activities, such as eating, reading and using public transportation.

While Mr. Simon initially had a great deal of difficulty acknowledging and accepting these new limitations on his ability to function, he has made great advances in this area and has expressed a strong desire to use his life as a lesson for others.

### III. Mr. Simon's State Conviction for the Same Offense Conduct

While Mr. Simon's criminal history suggests that he has had all-too-frequent contact with the police for traffic offenses and other crimes, until this offense he has never possessed a firearm. Notably, it was only after two failed attempts to take his life that Mr. Simon made the admittedly wrong decision to possess a firearm in an attempt to protect himself and his family.

Again, while Mr. Simon acknowledges that it was wrong to possess a firearm, he mistakenly believed this was the only way to protect himself after having had his life threatened. That poor decision is what led police officers to arrest Mr. Simon on March 17, 2007 in San Mateo County on charges of being a felon in possession of a firearm, resisting arrest, and battery on a peace officer. On March 29, 2007, a felony complaint was filed in San Mateo County Superior Court charging Mr. Simon with violations of California Penal Code §§ 12021(a), 69, and 243(c)(2), and Health & Safety Code § 11359.

On April 13, 2007, Mr. Simon entered into a plea agreement that his counsel negotiated with San Mateo County Deputy District Attorney Christine Ford. Pursuant to that agreement, Mr. Simon pled no-contest in San Mateo County Superior Court to one count of being a felon in possession of a firearm, in violation of California Penal Code § 12021(a), and one count of resisting arrest, in violation of California Penal Code § 69. In exchange, the State moved to dismiss the remaining counts of the information. Pursuant to the negotiated disposition, the San Mateo County Superior Court imposed a sentence of two years in state prison.

One week later, on April 20, 2007, the Department of Justice issued a *Petite* waiver authorizing the United States Attorney's Office to prosecute Mr. Simon under 18 U.S.C. § 922(g)(1). On May 29, 2007, a federal grand jury returned an indictment charging Mr. Simon with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

On or about July 29, 2007, Mr. Simon was transferred from the custody of the California Department of Correction to the United States Marshals Service pursuant to a writ of habeas corpus ad prosequendum. On July 30, 2007, Mr. Simon made his initial appearance in federal district court. On September 14, 2007, pursuant to a plea agreement, Mr. Simon pled guilty to one count of 18 U.S.C. § 922(g)(1), for being a felon in possession of a firearm based on the exact same conduct that was the basis for his state conviction.

The plea agreement provides for a sentence no higher than the low end of the sentencing range for offense level 21, less the time already served on his state conviction. Plea Agreement,

¶ 8. It further provides that Mr. Simon may seek a departure from the Guidelines range based on the fact that he has already been convicted and sentenced for the same offense conduct. *Id.* at ¶7.

## DISCUSSION

### I. The Court Can Remedy the Inequity of This Successive Federal Prosecution By Sentencing Mr. Simon to Twenty-Four Months

Martin Simon was prosecuted in state and federal court for identical offenses arising out of the same course of conduct. Because the federal government did not indict Mr. Simon until his conviction in state court was final, Mr. Simon was completely thwarted in his ability to meaningfully defend against the federal charge. Instead, he had no choice but to accept responsibility for his offense and plead guilty to the charge against him. While this situation may be constitutionally permissible, it is patently unfair and begs for the Court's involvement in crafting the appropriate remedy. Mr. Simon suggests that the most appropriate remedy for this inequity is to sentence him to twenty-four months – a sentence that another court has already determined is appropriate for this same conduct – to be run concurrently with his state sentence.

#### A. Recent Supreme Court Authority Supports a Sentence of Twenty-Four Months

Recent Supreme Court authority makes clear that this Court has the authority to consider the sentencing discrepancy between the state sentence (24 months) and the proposed federal sentence (77 months) as a basis to impose a below-guideline sentence under 18 U.S.C. Section 3553.

In *Gall v. United States*, 128 S. Ct. 586 (2007) and *Kimbrough v. United States*, 128 S. Ct. 558 (2007), the U.S. Supreme Court resoundingly supported a district court's ability to fashion an appropriate individualized sentence, which will be reviewed with the same abuse of discretion deference regardless of the degree of variance from the United States Sentencing Guidelines:

> We now hold that, while the extent of the difference between a particular sentence and the recommended Guideline range is surely relevant, courts of appeals must review all sentences whether inside, just outside, or significantly outside the Guidelines range –

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.                    6

under a deferential abuse-of-discretion standard. We also hold that the sentence imposed by the experienced District Judge in this case was reasonable.

*Gall*, 128 S. Ct. at 591.

The Court's decision in *Gall* rejects an "appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guideline range." *Id.* at 595. That heightened showing that was required for below-guideline sentences comes "too close to creating an impermissible presumption of unreasonableness." *Id*. The Court's decision similarly rejects "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id*.

The Court in *Gall* lays out the procedure to be undertaken by the district court:

(1) "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however." *Id.* at 596.

(2) "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable . . . He must make an individualized assessment based on the facts presented." *Id.* at 596-97.

(3) "If [the district court] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* at 597.

(4) "After settling on the appropriate sentence, [the district court] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.*

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.          7

In its review of the district court's sentence, the appellate court may not presume that a sentence outside the guidelines is *un*reasonable. "[I]f the sentence is outside the Guidelines range, the [appellate] court may not apply a presumption of unreasonableness. It may consider the extent of the variation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.*

### B. A Sentence of Twenty Four Months Will Adequately Account for All Federal Interests

Although the Supreme Court has never held that the Constitution categorically bars state and federal prosecution for the same act or transaction, *see Heath v. Alabama*, 474 U.S. 82, 88 (1985), it has consistently been "mindful of the potential for abuse in a rule permitting duplicate prosecutions." *Rinaldi v. United States*, 434 U.S. 22, 28 (1977).

Responding to this concern, the Department of Justice developed an internal policy commonly referred to as the *Petite* policy. *See* United States Department of Justice, United States Attorneys' Manual ("Manual"), Title 9, § 9-2.031 (2d ed. 2000); *see also Petite v. United States*, 361 U.S. 529, 531 (1960). This policy was designed to prohibit successive prosecutions based on the same transaction or occurrence "except when necessary to advance compelling interests of federal law enforcement." *Rinaldi*, 434 U.S. at 29 & n.14.

The *Petite* policy was enacted not only to promote efficient utilization of federal prosecutorial resources, but also to protect defendants from the unfairness of multiple prosecutions and punishments for substantially the same act or acts. *See id.* at 28 (noting that policy is supposed to "protect interests which, but for the 'dual sovereignty' principle inherent in our federal system, would be embraced by the Double Jeopardy Clause"). As such, it applies "whenever there has been a prior state or federal prosecution resulting in an acquittal, a conviction, including one resulting from a plea agreement, or a dismissal or other termination of the case on the merits after jeopardy has attached." Manual, § 9-2.031(C).

Here, Mr. Simon was convicted and sentenced for being a felon in possession of a

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.                                  8

firearm in San Mateo County. Accordingly, under the *Petite* policy, this successive federal prosecution was not warranted unless three criteria are satisfied:

> 1) The matter . . . involve[s] a substantial federal interest.
>
> 2) The prior prosecution . . . left that substantial federal interest demonstrably unvindicated.
>
> 3) The government . . . believe[s] that the defendant's conduct constitutes a federal offense, and that the admissible evidence probably will be sufficient to obtain and sustain a conviction.

Manual at 9-2.031(A).

According to the federal prosecutors' manual, the Department of Justice will generally "presume that a prior prosecution, regardless of result, has vindicated the relevant federal interest." *Id.* at § 9-2.031(D). While this presumption can be overcome when a state sentence is "manifestly inadequate," the manual cites as an example of such inadequacy "a case in which the charges in the initial prosecution trivialized the seriousness of the contemplated federal offense, for example, a state prosecution for assault and battery in a case involving the murder of a federal official." *Id.* Here, by contrast, Mr. Simon's state-court prosecution resulted in a serious felony conviction and a substantial prison term. As such, there is nothing about the state prosecution of this matter that left a federal interest "demonstrably unvindicated" and the government has provided no information to further inform that conclusion.

Unfortunately, the *Petite* henhouse is guarded by the fox; the Court cannot compel the government to adhere its own policy. *See United States v. Snell*, 592 F.2d 1083, 1087 (9th Cir. 1979). It can, however, ensure that the consequences of the government's decision *not* to adhere to the policy do not result in an unjust sentence.

**C.    Mr. Simon Has Been Prejudiced By This Successive Prosecution**

On April 13, 2007, Mr. Simon was sentenced in San Mateo County Superior Court; exactly one week later, on April 20, 2007, the Department of Justice authorized the United States

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.                9

Attorney's Office to proceed with the federal case. The prejudice that has inured to Mr. Simon as a result of the federal government's choice to wait until after Mr. Simon was convicted of and sentenced in the state court is extraordinary: Mr. Simon was unable to exercise his fundamental constitutional right to stand trial and testify in his own defense, since any attempt to do so would result in the admission of his plea in state court *to the very same offense* for which he was accused. *See* Fed. R. Evid. 609; *Brewster v. City of Napa*, 210 F.3d 1093, 1096 (9th Cir. 2000).

Mr. Simon had lost a critical witness–himself–as the direct and proximate result of the sequence of events in which the federal government waited until Mr. Simon had pled guilty and been sentenced for the same conduct. As the only witness to the events who is not a police officer,[1] Mr. Simon was uniquely capable of offering testimony at trial. His unavailability as a witness was therefore detrimental to his defense. As such, Mr. Simon had no choice but to plead guilty to the federal charge.

The government need not have expressly intended to secure a strategic benefit; rather, the government's action is constitutionally problematic where the government acts "in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." *United States v. Lovasco*, 431 U.S. 783, 796 n.17 (1977). The timing of the federal indictment in this case strongly supports the inference that the United States Attorney's Office waited for Mr. Simon to be convicted in state court before initiating the federal prosecution. The government was surely aware that state-court proceedings were underway, and hence should have appreciated the likelihood that a conviction would ensue. Nonetheless, the federal government apparently took no measures to avert or stay the state-court action pending a federal investigation.

By waiting instead for the state-court conviction to become final, federal prosecutors secured a tremendous tactical advantage in this case: Mr. Simon could no longer defend himself

---

[1] Discovery supplied by the government reveals that efforts by law enforcement to locate civilian eyewitnesses to the events at issue were unsuccessful.

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.                   10

by offering testimony that was at odds with the version of events reported by law enforcement. This prejudice will not be remedied by simply reducing his sentencing by the amount of time he has served in state custody. Such maneuvering in order to "increase the odds of conviction" is, at a minimum, "questionable." *United States v. Ross*, 123 F.3d 1181, 1186 (9th Cir. 1997). When, as here, actual prejudice ensues, the Court must fashion a remedy. *See id.*

The government's decision to await the outcome of the state-court matter before indicting Mr. Simon offends traditional notions of decency and fair play. *See Lovasco*, 431 U.S. at 790. This is not a case in which federal authorities picked up a prosecution that the state elected not to pursue. It is not a case in which the state prosecuted but failed to obtain a conviction. It is not even a case in which the state prosecuted and convicted but failed to send the defendant to prison. Rather, Mr. Simon pled guilty to being a felon in possession of a firearm and was sentenced to state prison for precisely the length of time that state prosecutors recommended. When the state court sentenced Mr. Simon, it did not do so in anticipation of a successive federal sentence. To the contrary, neither side was aware of or even contemplated a successive federal prosecution. Thus, the state court sentence was not reduced or somehow lower than what any other defendant in that situation would have received.

The government's own prosecutorial manual recognizes that a successive federal prosecution under these circumstances is wrong. Dual sovereignty is not a license to perpetuate the very evil that the Double Jeopardy Clause was designed to prevent, *viz.*, dual punishments for a single offense. *See Rinaldi*, 434 U.S. at 28 (noting that *Petite* policy "protect[s] interests which, but for the 'dual sovereignty' principle inherent in our federal system, would be embraced by the Double Jeopardy Clause"). That the government has the power to violate the *Petite* policy does not mean that a second punishment is consonant with the values enshrined in the Bill of Rights.

Successive prosecution is especially offensive where, as here, the defendant has no meaningful opportunity to defend himself in the second case. There is a significant difference

between a successive prosecution that follows a dismissal or acquittal, and a successive prosecution that follows a conviction. In the former instance, the defendant retains the ability to mount an effective defense in the successive federal proceeding. In the latter event, the defendant is rendered impotent. Having made damaging admissions to resolve identical charges in the first forum, he cannot meaningfully exercise his constitutional right to mount an effective defense in the second.

### D. This Court Should Preserve the Spirit and Substance of the State Plea Disposition that Called for a Two Year Sentence for Mr. Simon's Conduct

If it is acceptable for the United States Attorney to prosecute Mr. Simon, it is acceptable–and shockingly easy–for the federal government to re-prosecute virtually *every* defendant who has been convicted and sentenced in state court for a drug- or firearm-related offense. That cannot be right. Defendants must be able to negotiate their cases in the state court with the understanding that their case will be resolved, not relitigated.

If Mr. Simon is sentenced to additional time in this Court, he will be denied the benefit of the bargain he reached in the state court. When Mr. Simon negotiated and accepted his state court plea agreement, no federal charges had been brought and he was completely unaware that any federal charges would be brought. He pled to – and was sentenced for – both the felon in possession charge and the resisting arrest charge. He resolved the state case in good faith with the state prosecutor for a sentence that all parties – including the state court – agreed was a fair and appropriate sentence for his conduct, two years. His sentence was for the exact same conduct that serves as the basis for his federal charge.

Moreover, the federal government has not asserted any new allegations or any particular federal interest that makes this case uniquely suited for a successive federal prosecution. Indeed, the only thing that makes this a federal offense is the fact that the firearm Mr. Simon possessed was manufactured in Virginia and then transported to California. The additional "factors in aggravation" that the U.S. Probation Officer included in her sentencing recommendation include

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.                12

1  nothing that was unknown to the state prosecutors and judge, and, more importantly, nothing that
2  is uniquely federal in interest.  To the contrary, the officer who apprehended Mr. Simon was not
3  a federal officer, and Mr. Simon was convicted and sentenced for resisting arrest.

4  Additionally, the Probation Officer attempts to use Mr. Simon's cognitive and physical
5  impairments as a sword against him and reason why he should be given a harsher sentence.  This
6  evidences a lack of understanding of Mr. Simon's fear for his life having been the victim of two
7  separate shootings.  Mr. Simon does have significant cognitive impairments that leave him
8  disinhibited and concrete in ideation, but if the purpose of his sentence is to ensure that he no
9  longer carries a firearm, a harsher sentence is going to do nothing in that regard *because of* his
10 impairments.  He does not have an awareness of his impairments and a harsher sentence will not
11 change that.

12 Regardless, none of the factors identified in the Presentence Report ("PSR") raise a
13 uniquely federal concern that makes this case any different from any other state conviction for
14 felon in possession.  Additionally, all of these factors were before the San Mateo court when it
15 determined that a twenty-four month sentence was appropriate.

16 This Court should preserve the disposition reached in the state court and sentence Mr.
17 Simon to twenty-four months to be run concurrently with his state sentence.

18 **II.     Mr. Simon's Criminal History Category is Significantly Overstated**

19 A sentence of twenty-four months is also warranted under 18 U.S.C. § 3553 because the
20 calculation of his criminal history significantly over-represents the seriousness of Mr. Simon's
21 criminal history.  *See also*, United States Sentencing Guidelines § 4A1.3(b)(1).  The PSR in this
22 case concludes that Mr. Simon has 13 criminal history points, placing him in Criminal History
23 Category VI, but just one point away from Criminal History Category V.

24 Mr. Simon has received four criminal history points for relatively minor offenses,
25 including misdemeanor convictions for driving with a suspended license, driving without a
26 licence, and providing false information to a police officer – all of which were related to

CR-07-0335 SI;
DEF.'S SENTENCING MEMO.                    13

apparently routine traffic stops.  While Mr. Simon does not mean to diminish the importance of enforcing traffic laws, these convictions have significantly increased Mr. Simon's criminal history category to a point that does not reflect the seriousness of his prior criminal conduct.

Additionally, it is apparent that his criminal history calculation is elevated based on "piggy backing."  Three criminal history points have been added in paragraph 41 of the PSR for Mr. Simon's conviction in San Mateo county for possession of cocaine for sale imposed on June 20, 2003.  Three criminal history points are also added in paragraph 38 of the report based on the same three year sentence imposed on June 20, 2003 because the new charge resulted in a violation of probation. (If not counted twice, the conviction in paragraph 38 would count for two, rather than three points.)  *See* USSG § 4A1.1(b).  While technically permissible under the United States Sentencing Guidelines, this double counting results in a criminal history category that significantly overstates Mr. Simon's prior offenses.  Notably, unlike those typically found in Criminal History Category VI, Mr. Simon has no prior violent offense.

Mr. Simon respectfully requests the Court grant a one category downward departure and variance in his criminal history, bringing him to Criminal History Category V.

## CONCLUSION

For the reasons stated, Mr. Simon respectfully requests that the Court sentence him to twenty-four months to be run concurrently with his state court sentence.

Dated: January 17, 2008

                                        Respectfully submitted,

                                        BARRY J. PORTMAN
                                        Federal Public Defender

                                              /S/

                                        JODI LINKER
                                        Assistant Federal Public Defender