# EXHIBIT A

Saundra M. Small
P.O. Box 26204
San Francisco, CA 94126

January 16, 2008

The Honorable Susan Illston
U.S. District Court, Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Re: Martin Lee Simon, Jr.

Dear Judge Illston:

My name is Saundra M. Small and I am writing in support of my son, Martin Lee Simon, Jr. I am aware that Martin has pled guilty to the crime of a felon in possession of a firearm and clearly understand the seriousness of such an offense. As a parent, I considered it my responsibility to instill in my son Bible truth, the importance of obeying the law, and the significance of respecting law enforcement. I also firmly explained to Martin that if he chose not to abide by the law that he should be ready to accept the consequences of his actions and any punishment received. Though I do not agree with or condone Martin's poor decision to carry a firearm, I certainly understand why he felt it necessary to do so and would appreciate it if you would take the following into consideration.

Since October, 1999 I have been a legal secretary employed by Baker & McKenzie, LLC in the Global Equity Services ("GES") practice group. Previously, for nine years I had the privilege of holding the position of Executive Assistant to Guy Saperstein of Goldstein, Demchak, Baller, Borgen & Dardarian (formerly Saperstein, Seligman, Mayeda & Larkin) and then went on to assist Barry Goldstein and Teresa Demchak after Mr. Saperstein retired. In addition, I was employed by Fenwick & West (formerly Fenwick, Stone, Davis & West) for approximately eight years as a word processor and then promoted to a lead position in the Accounting Department of their Palo Alto office until returning to school to further my education. I have been blessed to work for understanding and caring Founding and Managing partners. Each employer allowed me time off work to attend parent/teacher conferences, volunteer for school activities, accompany Martin to medical and dental appointments and time off for mother/son days. Working for top law firms in the Bay Area afforded me the opportunity to live in areas where Martin could attend decent schools and receive a good education. Martin is well liked by my current and former employers. He established close relationships with their children and often was invited to spend time at their homes, accompany them on outings and occasionally traveled with their families during summer vacations. Martin was the first dependent of a Baker employee to be a victim of a violent crime, therefore, allowances were made to add Martin to the firm's medical and dental plans. In addition, Baker provided substantial financial support by means of funds raised to assist with Martin's care. After almost 24 years as a legal secretary I recently enrolled in a two-year paralegal program. Acquiring a paralegal degree will allow me the opportunity to provide financial assistance to Martin and his family and/or relocate with Martin and obtain employment in that field earning a decent living in another state.

Judge Illston, I'm not perfect and when I reflect back I can now pinpoint areas where I could have handled certain situations differently. However, I always felt it was best to lead by example. I tried everything I knew to instill in Martin the importance of being a self sufficient law abiding citizen, but no matter what I did his father encouraged him to do the complete opposite; often assisting in and encouraging his wrongdoing. Martin worshipped the ground his father walked on. It was as if every word he spoke was gold. His father often referred to me as "forgetting where I came from", "trying to be white", and "stuck up and boojee". This misled our son to believe that obtaining an education or acquiring a good job was only for African Americans who thought they were better than others. This often left Martin under the impression that I was overprotective, non-supportive and trying to mode him into something he was not. It was extremely hurtful to see his father misuse his influence over Martin in such a

negative and destructive manner. This behavior often left me feeling that I was fighting a loosing battle, however, I refused to give up the fight.

For years I refused to acknowledge that I could not fill the gapping hole in Martin's heart left by his father's periods of absence, lack of interest, and misdirection. Arrangements were made for Martin to receive spiritual guidance, I took parenting courses, provided and participated in counseling sessions with Martin and individually (as the teenager years at times were quite challenging and it seemed that no matter how much I tried to reassure Martin of my love and support it was not enough which often left me feeling hopeless. I interviewed male mentors but after several interviews decided not to go that route. I went as far as to marry a man who was not so much a great match for myself but one who had my son's best interest at heart. Sadly, reality set in and it became evident that Martin had suffered great emotion harm and was not emotionally mature enough to handle or accept his father's rejection. For example, Martin was graduating from middle school and his father promised he would attend the graduation ceremony held at Green Valley Middle School in Fairfield, California. At the last minute, Martin Simon, Sr. informed our son that he had to take a driving test at the DMV and would not be in attendance. Martin was devastated and crushed to the point that my father had to pick him up off the floor. He did not want to attend the ceremony or his planned graduation party. I will never forget my son ask, "Papa, why would I want to walk across the stage if my dad is not going to be there?" Eventually, my father persuaded him to participate in the ceremony by reminding him that he had made the honor roll and expressed to him how much it meant to everyone to see him receive his excellence awards and certificate. Despite the fact that many family members (including his father's relatives), friends, and a few of my employers attended the ceremony we all knew it was extremely difficult for Martin because the one person who meant the world to him was absent.

As a Freshman attending Sequoia High School located in Redwood City, California Martin was an honor roll student, excellent saxophone player, and outstanding basketball player. Martin and I have traveled to different countries and islands because I wanted my son to see that there was an entire world outside East Palo Alto. I am confident that if his father had supported the positive accomplishments in his life he would not have taken the path he chose. Martin's father has always made an appearance when Martin was in trouble (and most recently when there was a possibility he might pass on). It became apparent that Martin would rather accept the attention he received from his father for his negative behavior than not to receive any attention from him at all. It really saddens me that many parents, both men and women do not see the importance of and how vital their role of being an active supportive parent plays on the outcome of their children's lives.

Experiencing my son's emotional pain and disappointments while growing up was one thing, but I'm confident there is nothing available to parents that can prepare you for the devastation you experience when an attempt is made on your child's life. While standing over Martin's hospital bed in the ICU ward at Stanford Hospital, trying to cope with the situation at hand, I contemplated the uncertainty the future held. I wondered if Martin would survive, prayed that he would not be left in a vegetated state, lose his eyesight, or have slurred speech as his surgeons had predicted. I considered how and what might be required for his rehabilitation and whether or not I would be capable of providing that care. One thing I did know was it would mean the world to Martin if the first person he saw when he came out of the coma was his father. I informed hospital personnel of this fact and when Martin started showing signs of movement his father was alerted and brought into his room. I observed as his father stood at Martin's bedside and encouraged him to wake up. Martin had loss considerable eyesight but he knew his father's voice and immediately smiled. When his father asked him who shot him Martin tried to respond. This brought great joy to my heart because I knew if my son did not make it at least he knew his father was there for him at that crucial moment.

Martin spent several weeks in the hospital and then was transferred to San Mateo Rehabilitation Center. He did not recognize me nor did he remember he had children, could not remember his name, birth date, experienced bouts of paranoia, removed his IV and catheter, constantly tried to leave the hospital and had to be restrained. It was extremely painful to watch him struggle to remember basic aspects of his life and to assist in his therapy. I went online and researched everything I could find on brain injury patients. I sat down with my son and assisted him with his occupational and vocational assignments and taught him just as I did when he was a small child. At times it was challenging because Martin's brain was still healing and so his attention span was very short. He had problems focusing and was easily distracted. His sense of independence or lack thereof caused him to experience anxiety, confusion and fear. Another factor that made his care difficult was Martin required 24 hour care and supervision and his sleeping pattern was greatly affected causing him to become nocturnal. This required that I stay up all night while Martin was awake and the majority of the day preparing meals, changing bandages, making

sure he took his medications on time, providing transportation to and from his many appointments, etc. Once it was apparent Martin would survive his father again became an absent parent not assisting with his care.

To further add to Martin's pain his father now shares with him details of the many activities he now shares with his younger son, Martel Simon. This is extremely painful for Martin and has expressed that he wished the brain trauma would have erased certain aspects of his childhood. He has witnessed his younger brother receive the love, time, and support he always longed for. His father has invited Martin to his brothers track and field activities and football games (activities he failed to attend for Martin) and does not understand why Martin is not supportive of his younger brother. I have explained to my son that he should not harbor resentment towards his younger brother, that his father has matured since he was a young boy and is he desperately trying not to make the same mistakes he made with him with his younger son. Therapist encouraged Martin to express his feelings to his father in a respectful way. Unfortunately when Martin mustered up enough courage to do so he was violently attacked by his father. I am very proud that my son showed the utmost respect for his father by not fighting back. Sadly, Martin was left with a swollen face and a broken spirit. In addition, Martin Sr. has enrolled his younger son in one of the best Catholic schools in Stanislaus County yet failed to support Martin in his brain injury program. This has left Martin not only feeling abandoned but replaced. He has voiced that he feels his father wished he had died on December 14, 2005 and how he feels he may have brought him to East Palo Alto on June 28, 2006 to be killed.

After 2 failed attempts made on his Martin's life (not related or in connection with drug dealing or any type of gang affiliation, but was related to jealousy over a woman); both attempts left Martin permanently disabled, and a rumored third attack in the works, left Martin feeling it was imperative to protect the lives of his family as well as his own. As a parent, I can't describe in words the absolute nightmare I have been forced to live, the unnerving feeling I experience when I occasionally see the perpetrator in passing, or what it was like to constantly look over my shoulder in fear as I accompanied my son to his many physical, occupational and vocational therapy appointments wondering when another attempt would be made on his life and/or if I or my grandchildren would be targets; or what it is like to continue to look over my shoulder in fear as it known within the community that I informed the authorities as to who is responsible for Martin's shootings. I went as far as tinting my car windows so I could discreetly provide transportation for Martin.

The person who tried to kill my son on two separate occasions (in broad daylight with no regard for others in the immediate vicinity) leaving Martin permanently disabled and facing a long jail sentence for carry a firearm to protect himself is currently in custody in the State prison system on unrelated charges and will soon be released. I fear that others will be harmed and the life or lives of their loved ones forever altered or destroyed as my family has experienced. On December 14, 2005, life as I had known changed forever. I had no choice but to take a leave of absence from my place of employment to care for Martin. I was forced to withdraw my application for a promotion in which I was a strong candidate and one that would have resulted in a significant pay increase. On June 28, 2006, while taking a much needed break from Martin's care and searching for possible residences to relocate Martin in the Maryland/Washington, D.C. area I left Martin in the care of his father. Once my plane landed and as I walked to the baggage claim area I called to check on Martin only to learn that he had just been shot a second time at my mother's residence in East Palo Alto. I was encouraged by the officer at the scene not to return home. Please note, Martin Sr. and I met with our son's parole officer before my departure to Washington, D.C. Martin Sr. was granted a pass for the time period I would be away and instructed to keep Martin at his home in Ceres, California. He was directed not to bring Martin to East Palo Alto or Menlo Park under any circumstances. I can not describe the shock and disbelief I felt when I learned our son had been shot again in East Palo Alto this time in the presence of my 15 year old cousin who was forced to dodge bullets while trying to protect Martin who due to limited eyesight did not see the shooters approach him. Fortunately my younger cousin was not harmed physically but he has suffered emotional stress as he saw the vehicle the shooter was driving. The most disturbing is the fact that my 68 year old mother witnessed the attack and called 911 for medical assistance. Immediately after the shooting, my mother started acting out of character, not remembering what had just happened, or recognizing family members. Within the hour she began to complain of an excruciating headache. Of course, everyone thought it was from the loud sound of the high caliber gun used during the shooting and the shock of the experience. My mother seemed to recuperate fine after a few days of rest, however, approximately a month later while traveling abroad, my mother collapsed in Poland and became seriously ill. A week passed before we could transport her home. My brother found my mother collapsed on the floor of her bedroom in the middle of night and she was rushed to the emergency room. Two additional trips were made to the emergency room and once examined by her regular physician my mother was diagnosed with post traumatic stress and forced to take several months off work

and forcing her to delay her much anticipated retirement and dream trip to Africa. My marriage did not hold up under the pressure and my now ex-husband, fearing for his life, relocated to his home state. After the Family Leave Act lapsed Baker & McKenzie graciously held my position open. Martin and I were able to survive on my life's savings for a year. The Baker & McKenzie's donation was a great assistance, however, Martin's medical expenses continued to cause a significant financial hardship for a period of time.

I will be the first to admit that Martin has made many unwise decisions in his life, but I feel that after what he has experienced over the past 2 years he is now ready to change his course. It's unfortunate that Martin had to learn this lesson the hard way. Martin clearly understands that his father's lack of cooperation and failure to abide by the instructions of his parole officer almost cost him his life. He acknowledges that he may never establish the kind of father/son relationship he has longed for with his father and that street life only leads to prison or death. Martin has expressed that upon his release his main focus will be to give his sons what he did not receive from his father, to guide them in a different direction than the one his father lead him, and to get to know them individually and to take into consideration their emotion makeup. He has expressed an interest in mentoring other young men to try to help them see that street life leads to a dead end and even if a person survives there are both physical and emotional scars that remain a lifetime. What brings me great satisfaction is Martin acknowledging all the hard work I put in trying to spare him from making the mistakes he has made and thanking me for never condoning his wrongdoing.

Previously, I never thought about how Martin would care for himself after my passing as he was capable of caring for himself. Parents assume you will pass on before your children. Now that Martin is faced with disabilities and challenges his future care and well being is my chief concern. I would like the opportunity to relocate Martin and his family out of the state of California where they can live without fear. I am prepared to purchase a home for Martin and his family in an area where his children can obtain a good education, his fiancé can find gainful employment in the nursing field, and Martin can freely attend programs that will afford him the opportunity to learn how to care for himself and his family. When Martin was arrested he was enrolled in a brain injury program offered at City College of San Francisco and progressing quite well. Martin would greatly benefit if he had the opportunity to continue to improve his cognitive skills to the best of his ability <u>outside</u> the Federal prison system.

Judge Illston, I love my son so much that I never had any other children because I did not think I could love another child as much as I loved Martin and I will never give up hope that Martin will turn his life around or withdraw my support. I would like to request that Martin be sent to the nearest Federal **medical** facility where, if necessary, he will be able to receive prompt medical treatment. In addition, this will allow our family to visit Martin regularly and provide the love and support he needs as well as allow him the opportunity to spend time with his young children and build on their father/son relationship before his release.

Best regards,

*[signature]*

Saundra M. Small